IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GENERAL MOTORS CORP., | : | No. 07-CV-1493 |
| Plaintiff, | : | |
| v. | : | Judge John E. Jones III |
| SABLE MOTOR CO., INC., et al. | : | |
| Defendants. | : | |

# MEMORANDUM

## May 19, 2009

**THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:**

Pending before this Court is the Plaintiff General Motors Corporation's ("GM") Motion for Summary Judgment on Defendants' counterclaim. (Rec. Doc. 50). For the reasons stated below, we will grant the Motion in its entirety.

**PROCEDURAL HISTORY:**

On August 14, 2007, GM initiated this action by filing a Complaint. (See Rec. Doc. 1). The Complaint contains only one (1) count, which seeks "specific performance and enforcement" of an allegedly breached contract. (Id. at 6). On September 4, 2007, all Defendants[1] filed their initial Motion to Dismiss (Rec. Doc.

---

[1] The following are named as Defendants in this action: Sable Motor Co., Inc. ("SMC"), Jack Sable ("Jack"), Morry Sable ("Morry"), Herc, Inc. ("HERC"), and Anthony Horbal ("Horbal"). Jack and Morry will be collectively referred to as the "Sables."

1

9), and on September 10, 2007, they filed a second Motion to Dismiss (Rec. Doc. 11). On January 31, 2008, we issued a Memorandum and Order denying the aforesaid Motions. (See Rec. Doc. 26).

As a result of our January 31, 2008 Memorandum and Order, on February 20, 2008 Defendants filed their Answer. (See Rec. Doc. 27). Notably, the Answer contains a section marked "Counterclaim," which enumerates four (4) Counts: Count 1 alleges breach of contract; Count 2 alleges bad faith; Count 3 alleges "promissory estoppel/detrimental reliance;" and Count 4 alleges "intentional and/or negligent misrepresentation." (Id. at 5, 12, 13) (emphasis omitted).

On March 11, 2008, Plaintiff filed a self-styled "Motion for Summary Judgment or to Dismiss Defendants' Counterclaim" (Rec. Doc. 28). In our Memorandum and Order of June 18, 2008, we granted that motion as it related to Count II of the counterclaim and denied it in all other respects. (Rec. Doc. 40). On December 30, 2008, Plaintiffs filed a second "Motion for Summary Judgment to Dismiss Defendants' Counterclaim" (Rec. Doc. 50) (the "Motion") as well as a Motion to Voluntarily Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(I) (Rec. Doc. 52).

On April 16, 2009, the parties entered into a stipulation wherein they agreed to the dismissal of the Complaint pursuant to Rule 41(a)(1)(A)(I), the granting of

the Motion as it relates to the Sables and SMC, and the subsequent dismissal of the counterclaims asserted by the Sables and SMC against GM. (Rec. Doc. 70). That document effectively terminated the Sables and SMC as parties to this action, meaning that the only remaining claims to be litigated are the counterclaims of HERC and Horbal as asserted against GM. Accordingly, those counterclaims are the only claims to which the instant Motion has relevance.[2] Having been fully briefed, the instant Motion is ripe for disposition.

**STANDARD OF REVIEW:**

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. <u>Id.</u> at 325. Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). An issue is

---

[2] Accordingly, the term "Defendants," as used heretofore, will only refer to HERC and Horbal.

"genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on allegations of denials in its own pleadings; rather, its response must ... set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." Jones v. United Parcel Serv., 214 F.3d 402, 407 (3d Cir. 2000). Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." Jersey Cent. Power & Light Co. v. Twp. of Lacey, 772 F.2d 1103, 1109-10 (3d Cir. 1985). However, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the non- moving party. P.N. v. Clementon Bd. of Educ., 442 F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a fact finder could draw from them. Peterson v. Lehigh Valley Dist. Council, 676 F.2d 81, 84 (3d Cir. 1982). Still, "the

mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be a *genuine* issue of *material* fact to preclude summary judgment." Anderson, 477 U.S. at 247-48.

**FACTUAL BACKGROUND:**

At all relevant times, the Sables, through SMC, owned and operated a Chevrolet dealership in Pittsburgh, Pennsylvania pursuant to the terms of a Dealer Sales and Service Agreement (the "Sales Agreement") they had signed with GM. (See Rec. Doc. 59 Ex. A). The Sales Agreement required, *inter alia*, approval by GM in order to effect ownership change in the Chevrolet dealership. (See id.). The Sables entered into an Asset Purchase Agreement (the "Asset Agreement" or "initial application") to transfer to HERC[3] all the assets of SMC.[4] The Asset Agreement made the proposed transfer contingent upon GM's approval, as was required by the Sales Agreement.[5] On July 13, 2006, GM officially denied the

---

[3] HERC is a corporation whose shareholders consisted of Jack Sable and Anthony Horbal.

[4] The Asset Agreement included a clause whereby HERC would acquire 100% ownership of SMC from the Sables.

[5] It should be noted that in applying for such a franchise transfer, GM required the execution of a "Submission Acknowledgment." This document was read and signed by Jack Sable on behalf of SMC and stated, in pertinent part:
> Only the VICE PRESIDENT, VEHICLE SALES, SERVICE, AND MARKETING of GM or his/her explicit designate has authority to approve any request. Approval,

5

proposed change in ownership ostensibly because Horbal lacked "automotive retail

> if given, will be only in the form of either (a) a written Dealer Agreement and/or Addendum(s) executed on behalf of GM and the party named as "dealer," or (B) a written "Letter of Intent" to execute a Dealer Agreement and/or Addendum(s) executed on behalf of GM by either the VICE PRESIDENT, VEHICLE SALES, SERVICE, AND MARKETING or his/her explicit designate and accepted by requesting dealer. Any actions taken, expenditures made, or communications assumed, by Requestor, by anyone associated with requesting dealer company, or by the requesting dealer company itself, prior to receipt and execution . . . of such written Dealer Agreement shall be at requesting dealer's sole risk and responsibility without liability or obligation whatsoever on the part of GM or any of its representatives.
>
> \* \* \*
>
> Neither I nor anyone associated with me in current or requesting dealer company or the current or requesting dealer company itself will be entitled to rely upon any representation or statement indicating approval of this request made to me to anyone else by any representative or employee of GM or any other person whatsoever prior to receipt of Dealer Agreement and/or Addendum(s), or an appropriate "Letter of Intent" executed by GM.
>
> \* \* \*
>
> No representative or employee of GM, or any other persons, has the authority or power to approve or effect in any manner whatsoever any change in or modification to the terms of this request.
>
> \* \* \*
>
> This request and data has been prepared and submitted by and is the sole responsibility of the undersigned requestor, using his/her own independent judgment and determinations. Requestor represents that he/she has not relied on any oral or written statements or representations of GM or any of its representatives or employees. Further, both GM and the Requestor agree that GM makes no representation about the actual results expected by the requested dealership.

(Rec. Doc. 50 Ex. I). A submission Acknowledgment was signed on behalf of HERC on October 3. 2006. Further, Anthony Horbal submitted a "General Motors Application for Financial Investor," signed by him in three places, agreeing to disclaimers identical to those in the Submission Acknowledgment. (Id. Ex. J). Accordingly, we conclude that both Jack Sable and Horbal were aware of the disclaimers to which they agreed to be bound.

experience." (See id. Ex. B).[6]

After this initial denial, Horbal claims that he had a telephone conversation with William Fleck ("Fleck"), a GM Zone Manager,[7] wherein Fleck instructed HERC to change the ownership structure. (See id. Ex. E).[8] Specifically, Fleck advised that Jack Sable become a 15% owner in HERC and that he be retained as the Dealer Owner/Operator of SMC after the proposed transfer. (See id.). Fleck allegedly assured Horbal that if these changes were made to the corporate structure of HERC, GM would approve a second Asset Agreement ("second application"), if one were consummated. Relying on these representations, Horbal and Jack Sable prepared a second Asset Agreement reflecting the afore-referenced changes. (See id. Ex. D, pp. 20-22, 31, 46-48, 51; Ex. E, pp. 56-61, 68-70). In her affidavit, Maida claims that she worked intimately with Fleck's subordinates in properly filling out the second application, which she was led to believe was merely a

---

[6] Between February and July 2006, Horbal allegedly lent $1,000,000 to SMC apparently in an effort to keep SMC viable in light of the proposed change in ownership.

[7] Defendants contend that as a Zone Manager, Fleck was an authorized agent with the authority or apparent authority of GM to act on behalf of GM. See Mark Szymanski Dep. 15:12-24, August 6, 2008 (stating that Zone Managers had the "main" approval authority).

[8] Melissa Maida ("Maida"), an administrative assistant for HERC, executed an affidavit in which she claims to have been present and witnessed the telephone conversation at issue. Maida Aff. 2.

7

modification of the first application.[9] Madia Aff. 1.

Based on Fleck's representations, Horbal anticipated that the second application would be approved and accordingly advanced additional funds to SMC in order to keep it viable and solvent. (See Rec. Doc. E, pp. 58-60; Ex. H). The second application was submitted to GM on September 14, 2006. (Rec. Doc. 59 Ex. I). On December 15, 2006, GM notified Jack Sable that the second application had been rejected.[10] The Sables and GM responded by initiating a proceeding before the Pennsylvania State Board of Vehicle Manufacturers, Dealers, and Salesperson (the "Board").[11] Negotiations to settle that dispute ultimately failed, although GM was under the impression that it had reached an oral agreement that would have resolved the same. Consequently, on August 14, 2007, GM filed the instant action attempting to enforce that oral agreement. The proceeding before the Board was stayed pending resolution of this action. Horbal ceased advancing

---

[9] Indeed, Maida claims that Tracy LaBelle, one of Fleck's subordinates, "provided me with the numbers and told me where to put them" and "gave me specific instructions on how to complete the application correctly." Maida Aff. 2.

[10] On this point, Defendants argue that pursuant to Article 12 of the Pennsylvania State Board Vehicle Manufacturers, Dealers, and Salespersons Act, "[I]n no event shall the total time period for approval exceed 75 days from the date of the receipt of the initial forms." 63 P. S. § 818.12(b)(5) (2000). Accordingly, they claim that as of November 29, 2006, which was 75 days from the submission of their application, they believed that said application was approved in light of Plaintiff's failure to advise them otherwise.

[11] HERC and Horbal were not parties to the proceeding and do not have standing to initiate a protest before the Board.

monies to SMC and the Sables in August 2008 in an attempt to mitigate damages.[12] During the course of the litigation, Horbal and HERC filed the counterclaims against GM that are the only remaining subjects of the instant Motion.

**DISCUSSION:**

The only claims of any type currently pending before this Court are three counterclaims asserted by HERC and Horbal against the Sables and SMC. These counterclaims include the following causes of action: (I) breach of contract (Count I); (II) (II) promissory estoppel/detrimental reliance (Count III); and (III) intentional or negligent misrepresentation (Count IV).[13] We will address these counterclaims *seriatim*.

**A. Count I–Breach of Contract**

The basic elements of a contract are: offer, acceptance, and consideration.[14] See Koken v. Steinberg, 825 A.2d 723, 730 (Pa. Commonw. Ct.

---

[12] Horbal and HERC estimate that the Sables and SMC are indebted to them in the amount of approximately $2,000,000.

[13] As previously stated, we dismissed Count II of the Counterclaims (asserting bad faith) in our June 18, 2008 Order. (See Rec. Doc. 40).

[14] "Consideration" is defined as "[s]omething (such as an act, a forbearance, or a return promise) bargained for and received by a promisor from a promisee." BLACK'S LAW DICTIONARY (8th Ed. 2004). Pennsylvania courts have adopted this definition, holding that "[consideration exists where there is a bargained-for exchange by the parties to the contract." SKF USA, Inc. v. W.C.A.B (Smalls), 714 A.2d 496, 500 (PA. Commonw. Ct. 1998).

2003) (citations omitted). To maintain their breach of contract counterclaim, HERC and Horbal must prove three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." Fallabel v. Brophy-Wolter, 2008 WL 5600748 (Carbon Co. Ct. Com. Pl. 2008) (citing Omicron Sys., Inc. v. Weiner, 860 A.2d 554, 564 (Pa. Super. Ct. 2004). "'It is elementary law that no person can be sued for breach of contract who has not contracted, either in person or by an agent; or in other words who was not a party to the contract.'" Samuels v. Hendricks, 18 Pa. D&C 3d 561, 562 (Bucks Co. Ct. Com. Pl. 1981) (quoting Roman Mosaic & Tile Co., Inc. v. Vollrath, 313 A.2d 305, 307 (Pa. Super. Ct. 1973).

In the instant case, the Defendants assert that an oral contract was formed between GM and HERC through the conduct of Fleck as directed towards Horbal and in reference to the submission of a second Asset Agreement for GM's approval. In lodging this allegation, the Defendants assert that Fleck was an authorized agent of GM having either the actual or apparent authority to act on behalf of GM. We therefore must proceed to analyze the validity of these contentions.

"Actual authority" can be either express or implied. "Express actual authority" exists when "a principal directly states that an agent has the authority to

perform a particular act on the principal's behalf." Jones v. Van Norman, 513 Pa. 572, 587 (Pa. 1987). An agent has the implied actual authority to do all that is proper, necessary, and ordinary in exercising the express actual authority delegated to it.[15] See id. Apparent authority, on the other hand, flows from the conduct of the principal but focuses on the reasonable expectations of the party with whom the agent deals. See id. "If the agent has not been granted express authority and no authority can be implied from the principal's express statements, nevertheless, acts or omissions by the principal which lead a reasonably prudent person to believe such authority had been given to the agent, causes us to treat the matter as if authority had actually been granted." Id. at 588. Consequently, in determining whether Fleck was cloaked with the alleged agency power, we must analyze the conduct of his principal, GM.

It is clear from the Submission Acknowledgments signed by Jack Sable and Horbal, and from the Application for Financial Investor signed by Horbal, that GM did not in any way vest any of its representatives or agents with the actual authority to approve a change in or modification to the terms of an application. Both Jack Sable and Horbal were successful and sophisticated businessmen, which leads us to

---

[15] "Such implied authority is . . . based on the premise that the principal reasonably would want the act done in order to accomplish the express purpose of the agency." Jones v. Van Norman, 513 Pa. at 587.

the inference, which Defendants do not contradict, that they read and understood the terms of the documents in question. Consequently, we do not believe that they can credibly assert that Fleck had express or implied actual authority to approve their second application. Consequently, we believe that the only medium through which Defendants can possibly argue agency is via the concepts of apparent authority or agency by estoppel. However, a close examination of the record evidence reveals that these theories also fail.

As afore-stated, apparent agency vests when "acts or omissions by the principal . . . lead a reasonably prudent person to believe . . . authority had been given to the agent . . . ." Van Norman, 513 Pa. at 588. Defendants have not brought to our attention any evidence that GM knew of the alleged assurances Fleck gave to Defendants or that GM was aware of the assistance Fleck provided to Defendants in completing the second application.[16] Further, Defendants have

---

[16] Even if GM was aware of the assistance provided by Fleck to Defendants, which we do not believe is the case, such knowledge is not the dispositive issue in this case. The controlling issue is whether GM acted or failed to act in a way that indicated to a reasonable person that Fleck was authorized by GM to assure Defendants that their application would be approved if they complied with the suggestions and assistance he offered. Simply stated, we cannot locate any evidence of such conduct on the part of GM. Nor have the Defendants adduced evidence indicating that GM, as a custom and matter of practice, vested Zone Managers such as Fleck with the authority to unilaterally approve modifications to previously rejected franchise transfer applications or acquiesced in the exercise of such power by Zone Managers.

Indeed, during his deposition, Jack Sable testified that the agency authority he perceived to be vested in Fleck was based on "the way *he* talked to me all the time, all my dealings with *him*." Jack Sable Dep. 31:12-13, Sept. 17, 2008 (emphasis added) (essentially implying that Jack

brought to our attention no evidence indicating that GM was negligent in supervising Fleck, meaning that GM cannot be bound by the concept of agency by estoppel.[17] Since "[j]udges are not like pigs, hunting for truffles buried in briefs," U.S. v. Hoffecker, 530 F.3d 137, 162 (3d Cir. 2008) (quotations and citations omitted), we will not wade through the voluminous evidentiary record in search of disputed facts to which the Defendants have failed to alert us. Accordingly, we conclude that GM cannot be bound by any contract consummated between Fleck and the Defendants through the concepts of apparent agency or agency by estoppel. Since we perceive no other theories under which Defendants can bind Plaintiff to the alleged contract brokered by Fleck, it is our determination that GM was not a party to the alleged oral contract at issue. Accordingly, GM cannot be held liable for breaching that contract. We will therefore grant the instant Motion insofar as it

---

Sable found Fleck to be an honest and trustworthy man in previous dealings with him). This answer in no way implies that GM held Fleck out as having the ability to approve modifications in franchise transfer applications. When further asked what evidence the aforementioned belief was based upon, Jack Sable replied, "I have evidence of nothing. I just felt that . . . he had the knowledge [of the franchise transfer requirements] from General Motors." Id. 13:14-19. Accordingly, since there is no evidence from which a reasonable jury could infer that GM's acts or omissions led to the Defendants' belief that Fleck was vested with the authority to unilaterally modify and accept their application, we cannot permit Defendants to proceed under an apparent authority theory.

[17] Agency by estoppel vests when "a principal, by his culpable negligence, permits an agent to exercise powers not granted to him, even though the principal did not know or have notice of the agent's conduct." Apex Financial Corp. v. Decker, 369 A.2d 483, 444-45 (Pa. Super. Ct. 1976) (citations omitted).

is related to Defendants' breach of contract counterclaim.

**B.     Count III–Promissory Estoppel/Detrimental Reliance**

To recover on a theory of promissory estoppel, Defendants must show: "(1) [GM] made a promise that [it] should have reasonably expected would induce action or forbearance on the part of [Defendants]; (2) the [Defendants] actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise." Sullivan v. Charter Inv. Partners, LLP, 873 A.2d 710, 717-18 (Pa. Super Ct. 2005) (citations and quotations omitted).  As we have already discussed, Fleck's alleged conduct cannot be attributed to GM, as GM neither directly authorized it or impliedly ratified it.  Accordingly, GM could not reasonably expect that the Defendants would rely on the representation of one of its employees to the contrary.  Defendants therefore cannot satisfy the first prong of the promissory estoppel inquiry.  Consequently, the instant Motion will be granted to the extent it seeks dismissal of the promissory estoppel counterclaim.

**C.     Count IV–Intentional//Negligent Misrepresentation**

To sustain a counterclaim for intentional misrepresentation, Defendants must prove the following elements: "(1) representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness

as to whether it is true or false; (4) with intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." Presbyterian Med. Ctr. v. Budd, 832 A.2d 1066, 1072 (Pa. Super. Ct. 2003). As to their negligent misrepresentation counterclaim, Defendants must show: "(1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation." Halper v. Jewish Family & Children's Servs. of Greater Philadelphia, 963 A.2d 1282, 1286 (2009).

As we have already stated, Fleck's conduct was *ultra vires* and cannot therefore be attributed to GM. Consequently, it cannot be said that GM made a knowingly false representation, as required by the intentional misrepresentation framework, or a "misrepresentation of material fact," as required by the negligent misrepresentation framework. Since Defendants cannot satisfy the elements of this cause of action, we will grant the instant Motion to the extent it addresses the same.

**CONCLUSION:**

Since the Defendants have failed to adduce evidence that indicates GM cloaked Fleck with the authority to unilaterally approve modifications to previously rejected franchise transfer applications, they will be estopped from attributing Fleck's alleged conduct to GM. Accordingly, we will grant the instant Motion in its entirety. An appropriate Order will enter.